**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

JUSTIN SPROULE

    Plaintiff

v.

UNITED STATES FOOD AND DRUG
ADMINISTRATION, UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN
SERVICES, and THOMAS E. PRICE,
THE SECRETARY OF HEALTH AND
HUMAN SERVICES

    Defendants.

_____/

**COMPLAINT**

Plaintiff sues the United States Food and Drug Administration, the United States Department of Health and Human Services, and Thomas E. Price, the Secretary of Health and Human Services and alleges the following:

**NATURE OF THE CASE**

1.    Tobacco companies' effort to deceive the American public about the health effects of their deadly products dates back to the 1950s. To profit from death and disease, the industry targets youth, once called "replacement smokers," to replenish the supply. Tobacco companies also manipulate the levels of nicotine in cigarettes to create and sustain addiction.

2.    In promoting false health reassurance, there is no better shape-shifter. The industry first denied smoking's lethal effects; it then cast doubt on the overwhelming evidence to fabricate a health controversy where none existed. Meanwhile, tobacco companies offered bogus health

reassurance products like filtered cigarettes, "natural" cigarettes, "light" cigarettes, "mild" cigarettes, and "low tar" cigarettes.

3. The result is devastating. Smoking is the leading cause of preventable death. Cigarette smoking causes about one in every five deaths in the United States each year. This amounts to around 480,000 deaths annually. If smoking continues at the current rate among U.S. youth, 5.6 million of today's Americans younger than 18 years of age are expected to die prematurely from a smoking-related illness. This represents about one in every 13 Americans aged 17 years or younger who are alive today.

4. Natural American Spirit ("NAS") cigarettes perpetuate the type of false health impression that the tobacco industry has been peddling, all too successfully. NAS cigarettes are marketed as "Natural" "Additive Free" "100% Additive Free" and "Organic" – terms that represent health benefits and reduced risk. Santa Fe Natural Tobacco Company, with extensive help and oversight by R.J. Reynolds Tobacco Company and Reynolds American, Inc. make and promote NAS. By using these descriptors, the tobacco companies mislead NAS smokers to think that the cigarettes are safer than others.

5. Recognizing the deception, the FDA told Santa Fe in August 2015 that commercializing NAS violated the Family Smoking Prevention and Tobacco Control Act (the Act). The Act requires FDA approval to sell "modified risk tobacco products," like cigarettes with health descriptors, i.e. NAS. *See* 21 U.S.C. § 387k. The Act sets forth a notice and comment process that the FDA must follow, and substantive criteria that the FDA must apply, before issuing an order authorizing the interstate sale and distribution of any products that are represented to the public in any manner as "reduc[ing] harm or the risk of tobacco-related disease associated with commercially marketed tobacco products." *Id.*

6. Santa Fe has never submitted to FDA the application the Act demands for the distribution of modified risk tobacco products. Accordingly, no such application has been made available for public comment and the FDA has never made the findings necessary to approve such a product. Yet in flagrant violation of the Act, the FDA has declared that, without following the required procedures or standards Congress delineated precisely for the approval of modified risk tobacco products, "Santa Fe may retain use of the term 'Natural' in the 'Natural American Spirit' brand name and trademarks," and may also use the statements "Tobacco & Water" or "Tobacco Filler Ingredients: Tobacco & Water" on product labels, advertising, and promotional materials.

7. The FDA's authorization of Santa Fe's activities without following the Congressionally mandated process for public input and FDA approval constitutes agency action that is "arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law" in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2). Consequently, the FDA's action must be "set aside" pursuant to the APA. Absent this relief, consumers will continue to be deceived, NAS smokers will be irreparably harmed, and the public's statutorily mandated right to comment on a matter of urgent public health concern shall continue to be eviscerated.

## PARTIES

8. Plaintiff Justin Sproule resides in Palm Beach County and is a citizen of the State of Florida. Mr. Sproule has viewed the labels and packaging for Natural American Spirit cigarettes that are represented as "Natural" and "Additive Free." Mr. Sproule regularly purchased varieties of Natural American Spirit cigarettes, including purchases in Florida. He made those purchases because he believed that they were in fact made with additive-free tobacco and were safer and healthier because the cigarettes were represented to be "Natural" and "Additive Free." Mr. Sproule is a named lead plaintiff in the consolidated action *In Re: Santa Fe Natural Tobacco Company*

*Marketing & Sales Practices Litigation and Sales Practices Litigation*, 1:16-md-02695-JB-LF, which is pending in the District of New Mexico. Mr. Sproule represents a class of NAS smokers who were deceived by NAS labeling, packaging and advertising that contain the terms "Natural" and "Additive-Free." The FDA's failure to follow the provisions of the Act, as alleged herein, harm and will continue to harm NAS smokers, who believe and will continue to believe that NAS are Modified Risk Tobacco Products, as defined in the Act.

9. Defendant, the United States Food and Drug Administration (FDA), is an administrative agency of the United States Government within the Department of Health and Human Services. The FDA's headquarters are located in Silver Spring, Maryland. Congress has delegated authority to the FDA to administer the relevant provisions of the Family Smoking Prevention and Tobacco Control Act, 21 U.S.C. § 387 *et seq*.

10. Defendant, the United States Health and Human Services is an executive department of the United States Government and is headquartered in Washington, DC.

11. Defendant, Thomas E. Price, is Secretary of Health and Human Services and the official charged by law with administering the Act. The Secretary is sued in his official capacity. Secretary Price maintains an office in Washington DC.

12. All defendants are collectively referred to as the FDA or Defendants unless otherwise specified.

## JURISDICTION AND VENUE

13. This action arises under the Family Smoking Prevention and Tobacco Control Act, 21 U.S.C. § 387 *et seq*. and the APA.

14. The Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

15. An actual controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. §§ 705, 706.

16. Venue is proper under 28 U.S.C. § 1391(e).

17. This case is related to *In Re: Santa Fe Natural Tobacco Company Marketing & Sales Practices Litigation*, 1:16-md-02695-JB (D.N.M.).

## FACTUAL ALLEGATIONS

### A. The "Natural" and "Additive Free" Labeling and Advertising Campaign Drives Tremendous Growth and Market Share

18. NAS cigarettes are prominently labeled and advertised as "Natural" and "Additive Free" or "100% Additive Free." Some packs and advertisements contain the additional health descriptor "Organic" or "Made With Organic Tobacco."

19. The importance of "Natural" cannot be overstated: the word is part of the cigarette's brand name.

20. Reasonable consumers value natural products for important reasons, including the belief that they are safer or less harmful than other cigarettes that are not represented as natural.

21. "Natural" and "Additive Free" advertising claims have been used by throughout the history of selling NAS cigarettes. As Seth Moskowitz, a spokesman for Santa Fe, explained: "The aim is to drive brand awareness, highlight Natural American Spirit's 100-percent additive-free natural tobacco proposition, and generate trial among adult smokers."

22. NAS marketing, which is overseen by RJR, has been extremely successful.

   a. NAS is the fastest growing super-premium cigarette brand, and is a top 10 best-selling cigarette brand in the United States; it ranks second in California.

  b. NAS sales increased by 86% from 2009 to 2014, compared to an overall 17% decline in cigarette sales in the United States over the same time period.

  c. NAS's share of the market more than doubled between 2010 and 2015. In 2016, its share of the market increased to 2.2%.

  d. Sales volume for NAS cigarettes increased by 21.4% from 2014 to 2015 and 13.6% from 2015 to 2016. 5.4 billion NAS cigarettes were sold in 2016.

  e. Reynolds recently sold the international rights to the NAS brand name and trademarks for $5 billion.

23. The advertising and marketing campaign for NAS cigarettes is systematic and pervasive: all NAS consumers are exposed to the "Natural" and "Additive Free" representations.

**B.   NAS Health Descriptors Deceive Consumers**

24. NAS health descriptors like "Natural" "Additive Free" and "Organic" are used to deceive consumers into thinking that NAS cigarettes are safer or carry less risk of a tobacco-related disease than other cigarettes.

25. The claims "Natural" and "Additive Free" connote safer and healthier cigarettes because consumers associate smoking cigarettes that are not natural and those that have additives as dangerous and riskier.

26. Abundant peer-reviewed scientific literature demonstrates the belief.

27. Researchers at the University of California found, "[t]he idea that cigarettes are natural may also help smokers down-play the risks of smoking, as 'natural' risks inspire less concern than unnatural ones…smokers…frequently concluded that 'natural' cigarettes must be healthier or safer than cigarettes containing chemicals…"[1]

---

[1] McDaniel, Patricia A. & Ruth E. Malone, *"I Always Thought They Were All Pure Tobacco": American Smokers' Perceptions of "Natural" Cigarettes and Tobacco Industry Advertising Strategies*, 16 TOBACCO CONTROL e7 (2007)

28. This study concluded: "[t]he tobacco industry is adept at easing smokers' health concerns through such product modifications as filters and (seemingly) reduced tar. American tobacco companies have understood, for decades, that 'natural' is similarly misleading and implies unwarranted health claims."[2]

29. A December 2016 study, conducted by researchers at the Schroeder Institute for Tobacco Research and Policy Studies, found that "Consumers believe that cigarettes marketed with these ['natural' 'additive free' and 'organic'] and similar descriptors are significantly more appealing, healthier or less harmful than packages without these descriptors. Such misperceptions may encourage smokers to switch cigarettes brands rather than quit smoking entirely, or may increase intent to try a product. No research has determined that NAS cigarettes are less harmful to human health than other cigarette brands. Carbon monoxide, tart, heavy metals and other particulate matter are present in conventional band in 'organic', 'natural' or 'additive free' cigarette smoke."[3]

30. This study also concluded that pack disclaimers do not alter consumers' belief that NAS are less harmful than other cigarettes.

31. These researchers, teamed with those at the Johns Hopkins Bloomberg School of Public Health, and Global Health, New York University, determined that these health descriptors extended to youth as more appealing, healthier or less harmful than other cigarettes, and that "reduced harm messages conveyed by the tested descriptors increase the appeal of American Spirit cigarettes. Indeed, the cross-sectional association between perceived reduced harm and prior use

---

[2] *Id.*
[3] Pearson, Jennifer L., et al., *Misperceptions of harm among Natural American Spirit smokers: results from wave 1 of the Population Assessment of Tobacco and Health (PATH) study (2013-2014)*. Tobacco Control (Dec. 6, 2016) at 1.

of American Spirit cigarettes suggests that these descriptors may drive experimentation or use of this brand."[4]

32.     In a survey of more than 1000 U.S. smokers, 60% thought that removing additives made a cigarette less dangerous to smoke, and 73% believe that cigarettes with additives were more harmful than those that did not have additives.[5]

33.     Anticipating regulators' concern that marketing an additive-free cigarette implies untruthful health claims, Reynolds conducted marketing studies to show otherwise. Reynolds did not like the result: to the contrary, the research demonstrated that consumers believed additive-free cigarettes *were* safer or healthier despite Reynolds' leading and biased questions.[6]

34.     Because the tobacco industry's "market research show[s] that consumers incorrectly interpret the word 'natural' to mean that the ['natural'] cigarettes are safer and healthier than other cigarettes," in a case that found that tobacco manufacturers were violating the Racketeer Influenced and Corrupt Organizations Act ("RICO"), U.S. District Judge Gladys Kessler ruled that "natural" is a "forbidden health descriptor." *U.S. v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1, 938 (D.D.C. 2006).

C.     **The Family Smoking Prevention and Tobacco Control Act**

35.     To protect the public health, Congress enacted the Family Smoking Prevention and Tobacco Control Act, which became law on June 22, 2009 (the Act).

36.     Congress found, in pertinent part:

---

[4] Pearson, Jennifer L., et al., *American Spirit Pack Descriptors and Perceptions of Harm: A Crowdsourced Comparison of Modified Packs*, Nicotine & Tobacco Research 18(8): 1749-1756, 1755 (2016)
[5] Cummings, K.M., et al., *Are Smokers adequately informed about the health risks of smoking and medicinal nicotine?*, Nicotine & Tobacco Research 6(3): S333-340 (2004)
[6] *Id.*

a. The use of tobacco products by the Nation's children is a pediatric disease of considerable proportions that results in new generations of tobacco-dependent children and adults.

b. Because past efforts to restrict advertising and marketing of tobacco products have failed adequately to curb tobacco use by adolescents, comprehensive restrictions on the sale, promotion, and distribution of such products are needed.

c. It is in the public interest for Congress to enact legislation that provides the Food and Drug Administration with the authority to regulate tobacco products and the advertising and promotion of such products.

d. Comprehensive advertising restrictions will have a positive effect on the smoking rates of young people.

e. It is essential that the Food and Drug Administration review products sold or distributed for use to reduce risks or exposures associated with tobacco products and that it be empowered to review any advertising and labeling for such products. It is also essential that manufacturers, prior to marketing such products, be required to demonstrate that such products will meet a series of rigorous criteria, and will benefit the health of the population as a whole, taking into account both users of tobacco products and persons who do not currently use tobacco products.

f. Unless tobacco products that purport to reduce the risks to the public of tobacco use actually reduce such risks, those products can cause substantial harm to the public health to the extent that the individuals, who would otherwise not consume tobacco products or would consume such products less, use tobacco products purporting to reduce risk. Those who use products sold or distributed as modified risk products

    that do not in fact reduce risk, rather than quitting or reducing their use of tobacco products, have a substantially increased likelihood of suffering disability and premature death. The costs to society of the widespread use of products sold or distributed as modified risk products that do not in fact reduce risk or that increase risk include thousands of unnecessary deaths and injuries and huge costs to our health care system.

  g.  The dangers of products sold or distributed as modified risk tobacco products that do not in fact reduce risk are so high that there is a compelling governmental interest in ensuring that statements about modified risk tobacco products are complete, accurate, and relate to the overall disease risk of the product.

  h.  Permitting manufacturers to make unsubstantiated statements concerning modified risk tobacco products, whether express or implied, even if accompanied by disclaimers would be detrimental to the public health.

  i.  The only way to effectively protect the public health from the dangers of unsubstantiated modified risk tobacco products is to require that the Food and Drug Administration follow certain procedures and make certain findings before authorizing the sale of such products, including that products that tobacco manufacturers sold or distributed for risk reduction be reviewed in advance of marketing, and that the evidence relied on to support claims be fully verified.

37.    Congress required the FDA to implement the Act's provisions. Relevant here, the FDA cannot authorize the sale of tobacco products purporting to reduce the risk of tobacco-related disease actually reduce that risk unless the FDA follows the legislatively mandated process and criteria for doing so.

**D.    The FDA's Duties Concerning Modified Risk Tobacco Products**

38.    Modified risk tobacco products (MRTPs) are tobacco products that are "sold or distributed for use to reduce harm or the risk of tobacco-related disease associated with commercially marketed tobacco products." *See* 21 U.S.C. § 387k(2).

39.    MRTPs are tobacco products that represent in its "label, labeling, or advertising," either "implicitly or explicitly," that: (i) the tobacco product presents a lower risk of tobacco-related disease or is less harmful than…other commercially marketed tobacco products; (ii) the tobacco product or its smoke contains a reduced level of substance or presents a reduced exposure to a substance; (iii) the tobacco product or its smoke does not contain or is free of a substance. MRTPs are also those that use descriptors "light", "mild", "low", or similar descriptors in its label, labeling, or advertising. *Id.* § 387k(2)(A).

40.    The Act categorically mandates that "[n]o person may introduce or deliver for introduction into interstate commerce any modified risk tobacco product unless an order issued [by the FDA] pursuant [the Act] is effective with respect to such product." *Id.* § 387k(a).

41.    To obtain FDA approval to market a MTRP, a manufacturer of such a product must submit an "application" which must include, e.g., "a description of the proposed product and any proposed advertising and label," the "conditions for using the product," the "formulation of the product," "sample product labels and labeling," "data and information on how consumers actually use the tobacco product," and "all documents (including underlying scientific information relating to research findings conducted, supported, or possessed by the tobacco product manufacturer relating to the effect of the product on tobacco-related diseases and health-related conditions, including information both favorable and unfavorable to the ability of the product to reduce risk or exposure and relating to human health." *Id.* § 387k(e).

42. The Act requires that, with the exception of trade secrets and other confidential commercial information, the FDA must "make the application" for a MTRP available to the public "and shall request comments by interested persons on the information contained in the application and on the label, labeling, and advertising accompanying such application." *Id.* § 387k(e). The FDA must also make the application available to the Tobacco Products Scientific Advisory Committee, which must provide its commendations on the application within 60 days. *Id.* § 387k(f)(2).

43. The FDA cannot issue an order approving an application for a MTRP unless the FDA determines the applicant has demonstrated that the product, as it is actually used by consumers, will: (1) "significantly reduce harm and the risk of tobacco-related disease to individual tobacco users"; and (2) "benefit the health of the population as a whole." *Id.* § 387k(1).

### E. FDA Has Unlawfully And Arbitrarily Authorized NAS Cigarettes Without Following The Procedures And Criteria Required By Congress

44. On August 27, 2015, the FDA issued a Warning Letter to Santa Fe and Reynolds. The FDA determined that NAS cigarettes were adulterated under § 387b(8) of the Act, because NAS are MRTPs sold or distributed without an FDA order of approval.

45. The FDA stated NAS cigarettes are MRTPs because the product labeling, "which uses the descriptors 'Natural' and 'Additive Free' represents explicitly and/or implicitly that the products or their smoke to do not contain or are free of a substance and/or that the products present a lower risk of tobacco-related disease or are less harmful" than other cigarettes.

46. On February 23, 2017, the defendants, Santa Fe, Reynolds and RJR, in a related action, *In Re: Santa Fe Natural Tobacco Company Marketing & Sales Practices Litigation*, 1:16-md-02695-JB (D.N.M.), disclosed a Memorandum of Agreement dated January 23, 2017 between the FDA and Reynolds.

47. Under the Memorandum of Agreement, the entities ostensibly agreed to resolve the issues raised in the Warning Letter as follows: the FDA will not initiate enforcement action so long as NAS are not advertised using the terms "natural" and "additive free." However, the Memorandum explicitly provides that Santa Fe "may retain use of the term "Natural" in the "Natural American Spirit" brand name and trademarks." Consequently, the Memorandum constitutes an FDA action that, in effect, authorizes Santa Fee to sell and distribute an MRTP without going through *any* of the procedures mandated by the Act – including public notice and comment on an application – and without FDA making *any* of the findings mandated by the Act for an FDA order authorizing an MRTP.

## CAUSES OF ACTION

## COUNT I: VIOLATION OF THE APA

48. Plaintiff repeats and realleges each paragraph above as if fully stated herein and further allege:

49. The FDA's Memorandum of Agreement expressly authorizing Santa Fe to market an MRTP without complying with the requirements for such FDA authorization, as imposed by Congress in the Act, constitutes agency action that is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, within the meaning of the APA. 5 U.S.C. § 706(2). This violation of the Act and the APA injures Plaintiffs in the manner set forth in ¶¶ 1-49. Consequently, the Court "shall set aside" the FDA's action. *Id.*

## PRAYER FOR RELIEF

Plaintiff is therefore entitled to an Order:

1. Setting aside the FDA's January 19, 2017 Memorandum;

2. Declaring FDA's Memorandum to be unlawful and in contravention of the Act;

3. Enjoining the FDA from entering into or reissuing the Memorandum in any form;

4. Awarding Plaintiffs' their attorneys' fees and costs; and

5. Awarding Plaintiffs such further relief as the Court deems just and proper.

Dated: June 6, 2017

Respectfully submitted,

s/Scott P. Schlesinger
Scott P. Schlesinger
Jonathan R. Gdanski
Jeffrey L. Haberman
SCHLESINGER LAW OFFICES, P.A.
1212 SE Third Avenue
Ft. Lauderdale, FL 33316
Tel: 954-320-9507
Fax: 954-779-7389
scott@schlesingerlaw.com
jgdanski@schlesingerlaw.com
jhaberman@schlesingerlaw.com